# UNITED STATES BANKRUPTCY COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 11 |
| | ) | |
| MURRAY, INC., | ) | NO. 304-13611 |
| | ) | |
| Debtor. | ) | JUDGE MARIAN F. HARRISON |
| | ) | |
| | ) | |
| WILLIAM KAYE, AS TRUSTEE OF | ) | ADV. NO. 305-0715A |
| THE MURRAY LIQUIDATING | ) | |
| TRUST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| AGRIPOOL, SRL, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

___

## MEMORANDUM OPINION
___

The Liquidating Trustee (hereinafter "Trustee") filed this adversary proceeding against the defendant to avoid and recover $271,242.90 plus interest as preferential transfers pursuant to 11 U.S.C. §§ 547 and 550. A trial of this matter was held on June 11, 2007, and the parties filed proposed findings of fact and conclusions of law on June 25, 2007. For the following reasons, which represent the Court's findings of fact and conclusions of law

pursuant to Fed. R. Bankr. P. 7052, the Court finds that the Trustee's complaint should be dismissed.

## I. BACKGROUND

The defendant is an Italian company with headquarters and a manufacturing facility located in Italy and another manufacturing facility in Hungary. The defendant manufactures a variety of parts for lawn and garden equipment, with an emphasis on the bags attached to such equipment for the purpose of "catching" grass, leaves, or snow. In 2003, the defendant began negotiations with the debtor to become a supplier of the grass catcher bags for lawn mowers manufactured by the debtor. The defendant ultimately supplied the debtor with polypropylene bags for its 20 and 22-inch push mowers. Shipments of grass catcher bags from the defendant to the debtor during 2003 and 2004 were via containership or boat. In 2003-2004, 75% of the defendant's revenues were derived from the manufacture of grass catcher bags for lawnmowers, and 99% of all its products in that time frame were lawn and garden products.

The debtor filed a voluntary Chapter 11 petition on November 8, 2004 (hereinafter "Petition Date"). On September 23, 2005, the Court confirmed the debtor's Liquidation Plan (hereinafter "Plan"). On October 14, 2005, the Trustee filed this complaint against the defendant seeking to recover $271,242.90 in payments made by the debtor to the defendant

between August 10, 2004, and the Petition Date. The preferential payments were made in satisfaction of four invoices issued by the defendant:

| Payment Date | Clear Date | Invoice No. | Invoice Date | Invoice Age | Invoice Amount |
|---|---|---|---|---|---|
| 8/20/2004 | 8/20/2004 | 658 | 5/11/2004 | 101 | $68,943.00 |
| 8/20/2004 | 8/20/2004 | 719 | 5/26/2004 | 86 | $68,179.20 |
| 8/27/2004 | 8/27/2004 | 793 | 6/16/2004 | 72 | $67,838.10 |
| 8/27/2004 | 8/27/2004 | 819 | 6/24/2004 | 64 | $66,282.60 |

The parties stipulated that the Trustee had met his burden of proof as to each of the five elements of 11 U.S.C. § 547(b), and the sole issue to be determined is the applicability of the ordinary course of business defense set forth in 11 U.S.C. § 547(c)(2).

## II. DISCUSSION

Under the ordinary course of business defense, 11 U.S.C. § 547(c)(2),[1] a creditor can defend any alleged preferential payments to the extent such payments are:

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the [creditor];

---

[1]The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (hereinafter "BAPCPA") is not applicable to this case. Accordingly, the Code sections referred to are pre-BAPCPA.

3 - U.S. Bankruptcy Court, M.D. Tenn.

(B) made in the ordinary course of business or financial affairs of the debtor and the [creditor]; and

(C) made according to ordinary business terms.

The purpose of the ordinary course of business defense is to permit normal financial relations between a debtor and its creditors and to discourage unusual actions by either as a debtor approaches bankruptcy. *Waldschmidt v. Ranier (In re Fulghum Const. Corp.)*, 872 F.2d 739, 743 (6th Cir. 1989). This defense is intended to "protect recurring, customary credit transactions which are incurred and paid in the ordinary course of business of the Debtor and the transferee." *Id.* (Citations omitted.) *See also Roberds, Inc. v. Broyhill Furniture (In re Roberds, Inc.),* 315 B.R. 443, 454 (Bankr. S.D. Ohio 2004). Thus, a creditor asserting an ordinary course of business defense to preference avoidance must prove all three elements of 11 U.S.C. § 547(c)(2) by a preponderance of the evidence. *Smith Rd. Furniture, Inc. v. IBC Group, Inc. (In re Smith Rd. Furniture, Inc.)*, 304 B.R. 793, 795 (Bankr. S.D. Ohio 2003); *Prod. Steel, Inc. v. Sumitomo Corp. of Am. (In re Prod. Steel, Inc.)* 54 B.R. 417, 419 (Bankr. M.D. Tenn. 1985). In the present case, the parties have stipulated that the first element, 11 U.S.C. § 547(c)(2)(A), has been satisfied. Accordingly, the Court considers whether the remaining two elements of the ordinary course of business defense exist. *See* 11 U.S.C. § 547(c)(2)(B) and (C).

## A. § 547(c)(2)(B) - Subjective Prong

The Sixth Circuit has adopted a flexible approach in determining what constitutes ordinary course of business for preference purposes. It has concluded that transfers can still fall within the definition of "ordinary course" despite such factors as repeated late payments, changes in invoice terms, payments long after the invoice due date, payment of multiple invoices with one check, and other factors indicating that a vendor was "getting paid, though from a slow payer." ***Brown v. Shell Canada, Ltd. (In re Tennessee Chem.),*** 112 F.3d 234, 236-38 (6th Cir. 1997). In applying the ordinary course of business defense, an examination of the relationship between the specific debtor and creditor must be performed. ***Id.*** at 237. Deviations in the course of the relationship between the parties must be "substantial" in order to find a payment was made outside the ordinary course of business. ***Id.*** at 238; ***see also Hunter v. Amerisource Corp. (In re Parkview Hosp.)***, 213 B.R. 509, 515-16 (Bankr. N.D. Ohio 1997).

At trial, Matteo Castelli, the business development manager for the defendant from 2003 until January 2007, testified that all payments made by the debtor to the defendant were made by wire transfer, that the debtor never paid the defendant within the invoice terms of net-60 days and had in some instances paid over 100 days after invoice. According to the defendant's expert witness, Harold Schaeffer, the average number of days between invoice and payment by the debtor to the defendant during the pre-preference period was

approximately 80 days, and during the preference period, the average number of days between invoice and payment lengthened to 84 days. Thus, the difference in the average days between invoice and payment between the pre-preference period and the preference period was only four days. Moreover, the range of timing of the payments made by the debtor to the defendant during the pre-preference period fell between 62 and 126 days. The four payments made during the preference period were made 105, 90, 75, and 67 days after invoice. Based on these facts, Mr. Schaeffer, testified that all four of the preferential transfers were made within the pre-preference period payment range.

The Trustee's expert witness, Michael Atkinson, testified that there were not enough pre-preference transactions between the parties to provide any meaningful comparison and, therefore, the defendant could not establish consistency in the course of dealing during the preference period for purposes of 11 U.S.C. § 547(c)(2)(B).

The Court agrees with the analysis done by Mr. Schaeffer. While there is certainly a limited history of pre-preference transactions in this case, the Sixth Circuit has held that under 11 U.S.C. § 547(c)(2), "a transaction can be in the ordinary course of financial affairs even if it is the first such transaction undertaken by the customer." ***Gosch v. Burns (In re Finn),*** 909 F.2d 903, 908 (6th Cir. 1990). Thus, a limited transactional history does not prevent the Court from undertaking the analysis prescribed by the Sixth Circuit in ***Tennessee***

*Chemical.* Nor does it preclude the Court from finding that the transfers made during the preference period in this case satisfy the subjective prong of the ordinary course of business defense.

Factors to be considered in determining whether a transaction was ordinary include the timing of the transfer, the amount of the transfer, the manner in which it was paid, and the entire circumstances under which the transfer was made. *Yurika Foods Corp. v. United Parcel Serv. (In re Yurika Foods Corp.),* 888 F.2d 42, 45 (6th Cir. 1989); *Finley v. Mr. T's Apparel, Inc. (In re Washington Mfg. Co.)*, 144 B.R. 376, 378 (Bankr. M.D. Tenn. 1992); *In re Roberds, Inc.,* 315 B.R. 443, 455. Late payments are presumptively non-ordinary, but the presumption can be overcome with a showing that late payments were the normal course of business between the parties. *Logan v. Basic Distrib. Corp. (In re Fred Hawes Org., Inc.)*, 957 F.2d 239, 244-45 (6th Cir. 1992). Absolute consistency or perfection is not required. *Marlow v. Fed. Compress & Warehouse Co., Inc. (In re The Julien Co.),* 157 B.R. 834, 838 (Bankr. W.D. Tenn. 1993). Instead, "the standard is whether 'some consistency' between the pre and post-preference time period transactions can be established by a preponderance of the evidence." *Id.* (citations omitted). The degree of lateness of the alleged preferential transfer should be compared with other transfers between the parties. *Brown v. Shell Canada Ltd. (In re Tennessee Chem. Co.),* 112 F.3d 234, 237-38. In addition, where "a debtor makes an unusual payment or normal payment in response to

unusual collection practices, the debtor's subjective intent is relevant as to the ordinariness of the payment." *Speco Corp. v. Canton Drop Forge, Inc. (In re Speco Corp.)*, 218 B.R. 390, 401 (Bankr. S.D. Ohio 1998) (citations omitted).

There is no question that a comparison of the pre-preference period payment history to the preference period payment history between the defendant and the debtor substantiates a finding of consistency in the parties' course of dealings. *See In re Fulghum Constr. Corp.,* 872 F.2d 739, 743 ("[e]ven if debtor's business transactions were irregular, they may be considered 'ordinary' . . . if those transactions were consistent with the course of dealings between the particular parties"). The change in the average number of days for payment was slight and does not take the transactions out of the ordinary course of business. *See In re The Julien Co.,* 157 B.R. 834, 841 ("the three to four day swing in the average number of days between invoice and payment is simply not significant"). The proof showed that the debtor was late in making payments to the defendant throughout their business relationship. In the Sixth Circuit, if late payments are the standard course of dealing between the parties, late payments during the preference period will be considered as within the ordinary course of business under 11 U.S.C. § 547(c)(2)(B). *In re Fulghum Constr. Corp.,* 872 F.2d at 743.

Moreover, there was no proof at trial of any unusual collection activity by the defendant during the preference period that resulted in the payment of any amounts at issue

in the Trustee's complaint. Mr. Castelli confirmed that the defendant received its last pre-petition payment from the debtor two months prior to the petition date. He also testified that the defendant did not exert any payment pressure on the debtor prior to the petition date and that the defendant was not aware that the debtor was suffering financial difficulties until immediately before the petition date. Mr. Castelli's testimony was both credible and consistent with his testimony concerning the timing of the payments received by the defendant during the preference period. Mr. Castelli's testimony as to the seasonal nature of the business between the parties went unchallenged. And as Mr. Castelli testified, the payments received by the defendant in the summer of 2004 represented the logical conclusion of the parties' 2004 relationship, one that placed the debtor's lawn products in the hands of retailers in the spring of 2004.

There was simply no proof that the defendant asked the debtor to bring its balance current in the summer of 2004 or that the defendant changed its terms with the debtor in the summer of 2004. Nor was there any evidence of written correspondence indicating that unusual steps were being taken by the defendant to collect payments under outstanding invoices. While the debtor's former treasurer, Thomas Sharp, testified that some suppliers may have been privy to information concerning the debtor's financial problems during the preference period by virtue of their presence at the debtor's manufacturing facilities, Mr. Sharp was also clear that the defendant was not part of this contingent.

The proof showed that the debtor made all payments by wire transfer to the defendant, that there was no change in the terms of credit between the parties, that there was no evidence of any unusual collection practices, and that the amount of time between invoice and payment was consistent with the pre-preference period. Thus, the alleged preferential transfers are transfers that one would consider consistent, ordinary, and made in the ordinary course of business or financial affairs of these two parties. Accordingly, the Court finds that the defendant has met its burden under 11 U.S.C. § 547(c)(2)(B).

### B. § 547(c)(2)(C) - Objective Prong

The last element of the ordinary course of business defense is referred to as the "objective" test, as it examines whether transfers were "made according to ordinary business terms." 11 U.S.C. § 547(c)(2)(C). In other words, the Court must determine whether the transaction "comports with the standard conduct of business within the industry." ***Logan v. Basic Distrib. Corp. (In re Fred Hawes Org., Inc.)***, 957 F.2d 239, 246. The term "ordinary business terms" refers to the range of terms engaged in by firms generally similar to the creditor in question. Only dealings so idiosyncratic that fall outside a broad range should be deemed extraordinary and outside the scope of 11 U.S.C. § 547(c)(2)(C). ***Luper v. Columbia Gas of Ohio, Inc. (In re Carled)***, 91 F.3d 811, 818 (6th Cir. 1996). This does not require that the transaction conform with the majority of transactions within the parties'

industry. Instead, the "transaction [should not be] so unusual as to render it an aberration in the relevant industry." *Id.*

In the present case, the parties disagreed as to which industry was relevant. Mr. Castelli testified that 99% of the products manufactured by the defendant during the 2003-04 time frame were lawn and garden products and that 75% of the defendant's revenues during this period were generated by the production and sale of grass catcher bags, much like those appearing in instruction manuals accompanying the debtor's 20-inch push mowers. Based on these numbers, Mr. Schaeffer, the defendant's expert, concluded that the defendant was in the "Lawn and Garden Tractor and Garden Equipment Manufacturing" industry.

The Trustee's expert, Mr. Atkinson, on the other hand, identified the defendant's relevant industry as "canvas and related products," an industry that includes sails, tarps, and possibly tents. In reaching this conclusion, Mr. Atkinson did not conduct a physical examination of the defendant's product. Moreover, Mr. Castelli's unrefuted testimony was that the grass catcher bags manufactured for the debtor were made of polypropylene. In fact, the defendant does not manufacture any bags that contain cotton or canvas. The grass catcher bags supplied to the debtor were intended to function as a component for the debtor's push mowers. Accordingly, the Court concludes that the "Lawn and Garden Tractor and Garden Equipment Manufacturing" industry is relevant to this analysis.

Mr. Schaeffer based his payment analysis on information obtained from the Risk Management Association (hereinafter "RMA"), a 94-year old non-profit organization and a well-established source for credit information. RMA data does not include information for foreign companies. In order to compare the information compiled by RMA for companies in the United States with the payment history between these parties, Mr. Schaeffer made an understandable 30-day downward adjustment of the data from the payment history between the defendant and the debtor to account for the defendant's status as an Italian company shipping product via container ship to the United States. This adjustment reflected the 30 days required to transport goods from Italy to a United States port, including the time necessary to clear customs. By making such an adjustment, Mr. Schaeffer was able to evaluate the adjusted data from the relationship between the debtor and the defendant against the industry data compiled by RMA. Mr. Schaeffer's conclusions regarding the downward adjustment of the data by 30 days to account for shipping from a foreign country to the United States are summarized in the following table:

| **Average days between invoice and payment during preference period** | **Adjusted days between invoice and payment** | **Range of timing of payments** | **Adjusted range of timing of payments** |
|---|---|---|---|
| 84 days | 54 days | 67-105 days | 37-75 days |

Mr. Schaeffer testified that, according to RMA, the range of average payments for the defendant's industry is 23 to 58 days. As a result, Mr. Schaeffer found that the defendant

Case 3:05-ap-00715    Doc 50    Filed 10/09/07    Entered 10/09/07 13:08:21    Desc Main
Document      Page 12 of 13

and debtor's 54-day average between invoice and payment fell within the industry range. The Court found Mr. Schaeffer's testimony and analysis to be credible and sound.

The Trustee's expert failed to examine the appropriate industry, and therefore, his testimony did not present credible evidence regarding the "ordinary business terms" of similar firms. The proof at trial established that, when compared to the data for the defendant's industry, none of the transfers were "so unusual as to render them an aberration" in the industry. Accordingly, the Court finds that the defendant met its burden of proof under 11 U.S.C. § 547(c)(2)(C).

### III. CONCLUSION

Accordingly, the Court finds that the defendant is entitled to the ordinary course defense and that the Trustee's complaint should be dismissed.

An appropriate order will enter.

**This Memorandum Opinion was signed and entered electronically as indicated at the top of the first page.**